


**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

2018 AUG 22  PM 3: 46

CLERK OF COURT

| | | |
|---|---|---|
| BAY CITIES RECOVERY, INC. d/b/a DIGITALDOG AUTO RECOVERY, *Plaintiff/Counter-Defendant,* | §<br>§<br>§<br>§ | |
| v. | §<br>§ | Civil Action No. 4:18-cv-00280-A |
| DIGITAL RECOGNITION NETWORK, INC., *Defendant/Counter-Plaintiff,* | §<br>§<br>§<br>§<br>§ | |
| v. | §<br>§ | |
| LOCATION SERVICES, LLC, *Third-Party Defendant.* | §<br>§<br>§ | |

<u>**BRIEF IN SUPPORT OF PLAINTIFF / COUNTER-DEFENDANT**</u>
<u>**BAY CITIES RECOVERY, INC. d/b/a/ DIGITALDOG AUTO RECOVERY'S**</u>
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

Marshall M. Searcy, Jr.
State Bar No. 17955500
E-mail: marshall.searcy@kellyhart.com
Frank P. Greenhaw IV
State Bar No. 24002179
E-mail: pete.greenhaw@kellyhart.com
Caroline Brownlie
State Bar No. 24101562
E-mail: caroline.brownlie@kellyhart.com
**KELLY HART & HALLMAN LLP**
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone:     (817) 332-2500
Facsimile:     (817) 878-9280

ATTORNEYS FOR PLAINTIFF / COUNTER-DEFENDANT
BAY CITIES RECOVERY, INC. d/b/a DIGITALDOG
AUTO RECOVERY

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................ 1

II.   SUMMARY OF MOTION........................................................................... 3

III.  UNDISPUTED MATERIAL FACTS THAT SUPPORT SUMMARY
     JUDGMENT ............................................................................................... 5

IV.  SUMMARY JUDGMENT STANDARDS .................................................. 17

V.   ARGUMENT AND AUTHORITIES............................................................ 17

   A.   The Non-Compete in the 2014 Agreement is Governed by California Law
       and Is Unenforceable as a Matter of Law ......................................... 17

      1.  California Law Governs the Enforceability of the Non-Compete ........... 18

         a.  California Has a More Significant Relationship with the
            Parties and the 2014 Agreement than Texas................................ 19

           (i)    Place of Performance ...................................................... 19

           (ii)   Location of the Subject Matter of the Contract ............... 21

           (iii)  Place of Negotiation of the Contract................................ 22

           (iv)  Place of Contracting......................................................... 24

           (v)    Domicile, Residence, Nationality, Place of
                Incorporation, and Place of Business of the Parties......... 25

         b.  California has a materially greater interest than Texas in the
            enforceability of the non-compete ............................................... 26

         c.  California's fundamental policy disfavoring non-competes
            would be contravened by the application of Texas law............... 27

      2.  Under California Law, the Non-Compete is Unenforceable as a
         Matter of Law ...................................................................................... 28

   B.   The Non-Compete is Also Unenforceable Under Texas Law ............................. 29

      1.  Legal Framework ................................................................................. 29

      2.  The Non-Compete is Unnecessary; It does not Protect a Legitimate
         Business Interest .................................................................................. 31

         a.  The information DRN provided to DigitalDog was not
            confidential ................................................................................... 32

         b.  DRN provided no specialized training or instructions to
            DigitalDog to build up goodwill .................................................. 38

      3.  The Non-Compete is Unreasonable: Even if DRN Could Identify a
         Legitimate Interest Justifying a Non-Compete, This Non-Compete
         is Overbroad and Unreasonable ........................................................... 42

## TABLE OF CONTENTS CONT'D

C.    The Court Should Grant Summary Judgment in Favor of DigitalDog's
      Two Counts and Against DRN's Breach of Contract Count ............................... 46

VI.   PRAYER ........................................................................................................................... 48

## TABLE OF AUTHORITIES

Cases

*Allan J. Richardson & Assocs., Inc. v. Andrews,*
  718 S.W.2d 833 (Tex. App. 1986)........................................................ 30, 41, 42, 44
*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986)........................................................................... 17
*Application Grp., Inc. v. Hunter Grp., Inc.,*
  61 Cal. App. 4th 881, 72 Cal. Rptr. 2d 73 (1998)................................... 46
*APRM, Inc. v. Hartnett,*
  No. 01-01-00831-CV, 2002 WL 1435995 (Tex. App. July 3, 2002) ......... 43
*Arkley v. Aon Risk Servs. Cos., Inc.,*
  No. CV 12-1966 DSF (RZx), 2012 WL 2674980 (C.D. Cal. June 13, 2012) ......... 46
*Artec Grp. v. Klimov,*
  No. 15-cv-03449-EMC, 2016 WL 8223346 (N.D. Cal. Dec. 22, 2016)................. 29
*Aussie Pet Mobile, Inc. v. Benton,*
  No. SACV 09-1407, 2010 WL 2629556 (C.D. Cal. June 28, 2010) ........... 29
*Butler v. Arrow Mirror & Glass, Inc.,*
  51 S.W.3d 787 (Tex. Ct. App. 2001)...................................................... 45
*Cardoni v. Prosperity Bank,*
  805 F.3d 573 (5th Cir. 2015) ....................................................... passim
*CDX Holdings, Inc. v. Heddon,*
  No. 3:12-CV-126-N, 2012 WL 11019355 (N.D. Tex. Mar. 2, 2012)............... 44, 45
*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986)........................................................................... 17
*DeSantis v. Wackenhut Corp.,*
  793 S.W.2d 670 (Tex. 1990)...................................................... 18, 19, 27
*Dowell v. Biosense Webster, Inc.,*
  179 Cal. App. 4th 564, 102 Cal. Rptr. 3d 1 (2009)................................. 47
*ECL Grp., LLC v. Mass,*
  No. 3:17-CV-2399-D, 2018 WL 949235 (N.D. Tex. Feb. 20, 2018) ......... 18, 24, 27, 28
*Evan's World Travel, Inc. v. Adams,*
  978 S.W.2d 225 (Tex. App. 1998).................................................. 40, 45
*Exxon Mobil Corp. v. Drennen,*
  452 S.W.3d 319 (Tex. 2014)............................................................... 19
*Forsyth v. Barr,*
  19 F.3d 1527 (5th Cir. 1994) ............................................................. 17
*Gorman v. CCS Midstream Servs., L.L.C.,*
  No. 12-09-00204-CV, 2011 WL 1642624 (Tex. App. Apr. 29, 2011)......... 31, 38, 41
*Kenyon Int'l Emergency Servs., Inc. v. Malcolm,*
  No. H-09-3550, 2011 WL 6206766 (S.D. Tex. Dec. 13, 2011) ............... 46
*Lazer Spot, Inc. v. Hiring Partners, Inc.,*
  387 S.W.3d 40 (Tex. App. 2012).......................................................... 40
*Leath v. Tracer Constr. Co.,*
  No. 1:08-CV-358, 2009 WL 8188138 (E.D. Tex. Aug. 18, 2009) ........... 44
*Leon's Fine Foods, Inc. v. McClearin,*
  No. 05-97-01198-CV, 2000 WL 277135 (Tex. App. Mar. 15, 2000) ......... 48

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)................................................................................................ 17
*Maxxim Med., Inc. v. Michelson*,
    51 F. Supp. 2d 773 (S.D. Tex. 1999) ............................................................. passim
*McKissock, LLC v. Martin*,
    No. 16-cv-400, 2016 WL 8138815 (W.D. Tex. Nov. 10, 2016)........................ 18, 43
*Merritt, Hawkins & Assocs., LLC v. Caporicci*,
    No. 05-15-00851-CV, 2016 WL 1757251 (Tex. Ct. App. May 2, 2016)..................... 18, 26, 27
*Neurodiagnostic Tex, L.L.C. v. Pierce*,
    506 S.W.3d 153 (Tex. App. 2016)............................................................... 30, 31, 41
*Philip H. Hunke, D.D.S., M.S.D., Inc. v. Wilcox*,
    815 S.W.2d 855 (Tex. App. 1991), *writ denied* (Feb. 26, 1992)................................. 30, 40, 47
*Rimkus Consulting Grp., Inc. v. Cammarata*,
    255 F.R.D. 417 (S.D. Tex. 2008)................................................................................ 44
*Scott v. Snelling & Snelling, Inc.*,
    732 F. Supp. 1034 (N.D. Cal. 1990) ................................................................. 28, 29
*Simmons v. Lyon*,
    746 F.2d 265 (5th Cir. 1984) ........................................................................... 17
*SriCom, Inc. v. EbisLogic, Inc.*,
    No. 12-CV-00904-LHK, 2012 WL 4051222 (N.D. Cal. Sept. 13, 2012)................................ 47
*Valley Diagnostic Clinic, P.A. v. Dougherty*,
    287 S.W.3d 151 (Tex. App. 2009)............................................................................. 30
*Weatherford Oil Tool Co. v. Campbell*,
    161 Tex. 310, 314, 340 S.W.2d 950 (1960)............................................................... 48
*Weber Aircraft, L.L.C. v. Krishnamurthy*,
    No. 4:12-CV-666, 2014 WL 12521297 (E.D. Tex. Jan. 27, 2014) ...................................... 42, 43
*Zep Mfg. Co. v. Harthcock*,
    824 S.W.2d 654 (Tex. App. 1992)........................................................................ 30, 45

Statutes

Cal. Bus. & Prof. Code § 16600 .................................................................... 27, 28, 46
Cal. Bus. & Prof. Code § 17200 *et seq.*.......................................................................... 46
Restatement (Second) of Conflicts of Laws § 187(2)......................................................... 18
Restatement (Second) Conflicts of Laws § 188................................................................. 19
Tex. Bus. & Com. Code Ann. § 15.50.................................................................... 30, 46
Tex. Bus. & Com. Code Ann. § 15.51(c) (West)................................................................ 30, 47

Rules

Fed. R. Civ. P. 37............................................................................................ 33, 46
Fed. R. Civ. P. 56................................................................................................... 17

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| BAY CITIES RECOVERY, INC. d/b/a DIGITALDOG AUTO RECOVERY, *Plaintiff/Counter-Defendant,* | §<br>§<br>§<br>§ | |
| v. | §<br>§ | Civil Action No. 4:18-cv-00280-A |
| DIGITAL RECOGNITION NETWORK, INC., *Defendant/Counter-Plaintiff,* | §<br>§<br>§<br>§ | |
| v. | §<br>§ | |
| LOCATION SERVICES, LLC, *Third-Party Defendant.* | §<br>§<br>§ | |

## BRIEF IN SUPPORT OF PLAINTIFF / COUNTER-DEFENDANT BAY CITIES RECOVERY, INC. d/b/a/ DIGITALDOG AUTO RECOVERY'S MOTION FOR SUMMARY JUDGMENT

**TO THE HONORABLE JOHN H. MCBRYDE, UNITED STATES DISTRICT JUDGE:**

**NOW COMES** the Plaintiff / Counter-Defendant Bay Cities Recovery, Inc. d/b/a DigitalDog Auto Recovery ("DigitalDog"), and it files this *Brief in Support of DigitalDog's Motion for Summary Judgment.* In support thereof, DigitalDog would respectfully show the Court as follows:

## I. INTRODUCTION

DigitalDog is a California repossession company. DigitalDog's 84 employees, working from the company's thirteen California locations, service more than 400 cities throughout the state. Since its founding in 1998, DigitalDog has principally used traditional investigatory methods (known as "skip tracing") to search for and locate vehicles that DigitalDog's clients (e.g., auto-lenders) have listed as subject to repossession. Some skip tracing methods that the DigitalDog team uses to locate drivers-of-record (and by extension, the vehicle subject to

repossession) include researching the driver's physical address or addresses of other places that he or she is known to frequent, contacting known associates or searching public records like court filings, real property registrations, and credit records. DigitalDog's repossession truck drivers will then go out searching for the vehicle, and if found, repossess the vehicle in compliance with California state regulations. Or as it advertises, DigitalDog sniffs, runs, and fetches for its clients.

Starting in January 2010, DigitalDog began to supplement its skip tracing methods with license plate recognition ("LPR") technology. To do so, DigitalDog contracted with Defendant / Counter-Plaintiff Digital Recognition Network, Inc. ("DRN"). Even though DRN was the first company to offer LPR technology to help repossess vehicles, at the time, DRN was effectively a startup company that resold LPR cameras and licensed LPR software from its California-based sister company, who was already providing LPR technology to law enforcement agencies. DRN had no training programs in place. Because operating LPR technology is relatively straightforward —mount the cameras on the vehicle, plug them into in-vehicle laptops, download the software, and start scanning—DigitalDog was able to incorporate LPR into its business processes without help from DRN. DigitalDog got better at using LPR technology through day-to-day operations and from general experience.

In 2014, DRN changed its business model and required that DigitalDog sign a new contract to continue working with DRN. While LPR-repossessions account for less than 10% of DigitalDog's recoveries, the company had already invested substantial capital in using LPR technology from DRN, and DigitalDog desired to continue using LPR, so it eventually signed the new contract. A non-competition provision in the 2014 contract is the subject of this lawsuit.

The issue at the heart of this case is whether DRN can prevent DigitalDog, and each of its 84 California employees (including those who have never run LPR cameras), from working with Third-Party Defendant Location Services (or any DRN-competitor) in any capacity—including skip tracing—for one year after termination (until May 11, 2019). DigitalDog believes that the non-compete is unenforceable. Under the requisite choice-of-law analysis, California law governs the enforceability of the non-compete. And as a matter of policy, California will not enforce non-competes like the one at issue in this case. Even if Texas law governs the non-compete as DRN contends, the provision is also unenforceable because DRN has failed to meet its burden to show that the provision is necessary and reasonable.

Before filing this case, on April 11, 2018, DigitalDog gave notice that it was terminating the 2014 contract. Since May 11, 2018, the day the contract formally terminated, DigitalDog has not worked with DRN or run LPR cameras.

DigitalDog respectfully moves the Court to grant summary judgment on its two counts, one for a declaratory judgment that the non-compete is unenforceable and one for unfair competition against DRN, and against DRN's breach of contract count pending against DigitalDog, which is premised on the existence of a valid and enforceable non-compete.

## II.    SUMMARY OF MOTION

The non-compete at issue in this case is unusually and unnecessarily broad. DRN executive John Nethery was in charge of drafting and executing the 2014 contract at issue (which was blasted out with Nethery's pre-printed signature to all repossession agents working with DRN in 2014, not just DigitalDog). Nethery agrees that the non-compete blocks DigitalDog's administrative assistants from gaining employment at any DRN-competitor, and would even apply to janitors working for the company. By its terms, and as confirmed by Nethery, the non-compete also restricts DigitalDog's truck drivers who have never run LPR cameras from

3

working with a DRN-competitor, even if they continue to limit their role to skip tracing. Nethery conceded that the non-compete is "probably not" reasonable.

Given the reach of the non-compete and the implications for DigitalDog's 84 California employees, California law governs its enforceability. The 2014 contract states that Texas law applies, but Texas courts analyzing non-competes have routinely rejected such provisions in favor of applying another state's law (California, in particular) in circumstances such as are present here. As a matter of public policy, California will not enforce non-competes that restrict its citizens from engaging in a lawful profession, trade or business, but instead (with limited exceptions not applicable here), will protect and promote the important legal right of persons to engage in businesses and occupations of their choosing.

The non-compete is also invalid under Texas law. It is DRN's burden to prove the necessity for and reasonableness of the non-compete. DRN has not met its burden. DRN argues that the non-compete is necessary to protect its confidential information (despite the 2014 contract including a separate non-disclosure provision that DRN does not claim that DigitalDog has violated) and goodwill supposedly resulting from specialized training that was never provided. In responding to an interrogatory asking DRN to identify the confidential information it provided to DigitalDog necessitating this broad non-compete, however, DRN listed demonstrably public materials (like the identity of DRN's partners that it advertises on its website) and materials that were never provided to DigitalDog (like computer metadata that DigitalDog never had access to). And DigitalDog never received specialized training from DRN, and certainly not after the 2014 contract was executed. Texas will not tolerate restraints on trade like this non-compete that are not designed to protect a legitimate business interest. And even if DRN could have drafted a non-compete that could pass muster under Texas law

4

(which is doubtful given the evidence in this case), the one it drafted and blasted out in 2014 is unreasonable. When evaluating the reasonableness of a non-compete, the factual circumstances of each case must be considered. Here, all facts point to an overbroad and unreasonable restraint on trade without justification.

## III.   UNDISPUTED MATERIAL FACTS THAT SUPPORT SUMMARY JUDGMENT

The following are the material and undisputed facts upon which DigitalDog relies in its Motion:

### DigitalDog Is, and Has Always Been, a California Company

1.      DigitalDog, a California corporation, is a repossession company headquartered in El Dorado Hills, California. [APP. 399, 502]. It was founded in 1998 and, today, is one of the largest repossession companies in California, recovering more than 12,000 vehicles each year. [APP. 503]. It currently employs 84 people statewide, working at thirteen California locations (in addition to the corporate headquarters), and services more than 400 cities throughout California. *Id.* With one limited exception, from April 15, 2009, to February 13, 2012, when it attempted to expand into western Nevada with a Reno office, DigitalDog has operated and repossessed vehicles only in California, the single state in which it is licensed as a repossession agency. *Id.* Since at least early 2014, DigitalDog displayed on its website that its coverage area is limited to California, and it even provided a map showing the same. [APP. 305, 503].

2.      DigitalDog generally repossesses vehicles from individuals who financed their vehicles through banks or auto-lenders (collectively, "Lienholders") but defaulted on their loans. [APP. 504]. In most cases, DigitalDog is hired directly by the Lienholder. *Id.* Other times, a third party (known as a "forwarding company") contracts with Lienholders to manage accounts, then "forwards" repossession orders to DigitalDog. *Id.* Generally, under both scenarios, DigitalDog is hired to search for, locate, and repossess the vehicle. *Id.*

3.      Since its inception, DigitalDog has principally used traditional investigatory methods (known as "skip-tracing") to search for and locate vehicles.[1]  *Id.*  For example, DigitalDog might research the driver-of-record's physical address, or the address of other places that he or she is known to frequent, then search for the vehicle at those locations.  *Id.*  DigitalDog might also contact known associates or search public records—including court filings, real property registrations, or credit records—to help identify where the driver-of-record (and, by extension, the vehicle subject to repossession) might be at specific points in time.  *Id.*  When located, many debtors will voluntarily surrender their vehicle.  *Id.*  Other times, a court may order a seizure.  *Id.*

4.      As of 2014, and still today, approximately 90% of DigitalDog's vehicle recoveries come from locating and repossessing vehicles using traditional skip-tracing methods. [APP. 341-42].  The remaining 10% come from DigitalDog's use of LPR technology (described below).  *Id.*

5.      Michael Eusebio, DigitalDog's President and Founder, has always been interested in exploring and using technology to improve business processes, and DigitalDog's name is a reference to Eusebio's passion for incorporating technology into his business. [APP. 504].  With a background and interest in technology, Eusebio was naturally drawn to LPR technology when it was introduced in the repossession market. [APP. 505].

### DigitalDog Supplements Its Skip-tracing Tools with LPR Starting

6.      LPR is a secondary or supplemental method to repossess vehicles.  *Id.*  In basic terms, cameras mounted to vehicles operated by repossession companies (e.g., tow trucks) automatically scan license plates of parked and moving cars in the vicinity.  *Id.*  License plate images, along with date, time, and location coordinates (collectively, "LPR data"), are recorded.

---

[1] The term "skip-tracing" originated from the phrase "to skip town."

*Id.* The license plate numbers are compared to lists created by Lienholders (sometimes called "Hot Lists") identifying vehicles sought for repossession. *Id.* When there is a match (or "hit"), the repossession company may be notified, with instructions to repossess the vehicle. *Id.* Lienholders broadly distribute their Hot Lists, and work with multiple repossession and forwarding companies to improve the chances of recovery. [APP. 314-16].

7.      Lienholders must pay additional costs to access and use LPR data. [APP. 359]. For that reason, they may initially recommend or request traditional skip-tracing methods to locate vehicles, employing LPR technology only if some time has passed (e.g., 7-10 days of searching) and a vehicle proves harder to find.[2] [APP. 314-16].

### DRN is a Data Company that Offers LPR Technology

8.      DRN was formed in 2009. [APP. 351]. It is a Delaware corporation with headquarters in Fort Worth, Texas. [APP. 358]; Doc.[3] 7 at ¶ 11; Doc. 18 at ¶ 11. DRN is a self-described "data company." [APP. 198, 359]. Its focus is to sell or "monetize" LPR data, including by selling LPR data to Lienholders for repossessing vehicles. [APP. 359].

9.      DRN describes LPR data as "publicly visibly and publicly available information." [APP. 249]; *see also* https://drndata.com/truth-about-license-plate-recognition/ (last visited Aug. 21, 2018). DRN has explained that "LPR cameras simply take photographs of license plates and stamp the pictures with the date, time, and location coordinates of where they were taken, just like any modern smartphone camera." [APP. 249]. Chris Metaxas, DRN's former CEO, testified before state legislators that "[t]here is absolutely no expectation of privacy in a license plate" and that "LPR technology is simply photography." *See* http://www.lowellsun.com/todaysheadlines/ci_25511426/license-plate-readers-focus-bill-at-

---

[2] As one example, a vehicle might immediately be found at the registered driver's last known address, and the driver might freely surrender the vehicle, obviating the need for LPR technology.
[3] The "Doc. ____" reference is to the number of the item on the docket in this action.

statehouse (last visited Aug. 21, 2018).

      10.     DRN does not own trucks or have employees scanning license plates in the field. [APP. 360]. Instead, DRN contracts with repossession companies, like DigitalDog, to collect LPR data on its behalf. *Id.* Under those contracts, DRN (i) resells third-party cameras to repossession companies, and (ii) grants repossession companies access to third-party software to operate cameras, scan license plates, and transmit information to DRN's data center. [APP. 004-06, 361, 363-64, 370].

      11.     DRN owns and controls the LPR data collected by repossession companies (which, when they are under contract with DRN, are referred to as "Affiliates"), which is transmitted to DRN and stored in a database. [APP. 004]. Affiliates get a share of revenues that DRN makes from selling LPR data to Lienholders tied, in some capacity, to the volume of license plates scanned by the Affiliate. [APP. 021-022].

      12.     DRN does not design or manufacture LPR cameras. [APP. 361]. Instead, DRN's sister company Vigilant Solutions (formerly known as Vigilant Video) (hereafter "Vigilant Solutions"), a company located in California, designs and manufactures the LPR cameras that DRN sells to its Affiliates.[4]  *Id.* When an Affiliate purchases an LPR camera from DRN, the order goes to Vigilant Solutions, who ships the LPR camera directly to the Affiliate. [APP. 361-62].

      13.     DRN does not develop LPR software either. [APP. 364]. Again, Vigilant Solutions develops the LPR software that DRN licenses to its Affiliates. *Id.* The LPR software—CarDetector Mobile—runs on laptops in the cabin of the vehicle that are connected to the LPR cameras. [APP. 363-64]. While certain data is technically momentarily stored within

---

[4] When the Agreement at-issue was executed, DRN was a majority owned subsidiary of Vigilant Solutions. [APP. 029]. More recently, DRN and Vigilant Solutions restructured so that both are owned by VaaS International, such that DRN and Vigilant Solutions are typically referred to as "sister" companies today. [APP. 353].

the laptop before it is uploaded to DRN, Affiliates do not have access to that data. [APP. 370-71]. And, after the Affiliate terminates its relationship with DRN, its access to DRN's software is immediately cut off, and any related training has "no residual value" to the Affiliate. [APP. 374].

14.    In 2010, DigitalDog first executed an Affiliate Agreement ("2010 Agreement") and began collecting LPR data for DRN. [APP. 143-53, 505]. The 2010 Agreement is a contract between DRN and DigitalDog that sets the terms of the relationship between the parties. *Id.*

15.    The terms of that 2010 Agreement included a non-disclosure provision, a one-year non-competition provision, and a liquidated damages clause that required a payment of $25,000 if DigitalDog breached the non-competition provision. [APP. 145-46].

16.    The terms of the non-compete in the 2010 Agreement applied to: DigitalDog (the entity); its owners, partners and shareholders; the individual who executed the agreement; and, other entities or organizations owned in whole or part by any owner, shareholder, partner or principal of the repossession company. It did not cover drivers of repossession trucks or other employees of DigitalDog not listed. [APP. 144, 146, 379-80]. The 2010 non-compete covered "utilizing" LPR technology. [APP. 147]. Thus, under those terms, an Affiliate was permitted to work for a company that provided both LPR technology and traditional skip-tracing services if its role was limited to skip-tracing. [APP. 381-82].

17.    Sometime after executing the 2010 Agreement, DigitalDog completed a "DRN Affiliate Profile" that identified its areas of service as California and Nevada, and sent the profile to DRN. [APP. 489, 413, 505]. In 2012, DigitalDog updated its DRN Affiliate Profile, disclosing that its operations were limited to California. [APP. 490-501, 505].

**DRN was a New Company at the Time and Provided Little Support to DigitalDog**

18.     In 2010, DRN was still a new company.  [APP. 351].  DRN executive, John Nethery, described DRN as being a "startup company" in that timeframe.  [APP. 352].

19.     Collecting LPR data generally requires plugging in the LPR camera, downloading the relevant software, and driving the vehicle with the mounted cameras.  [APP. 365].  In fact, Nethery acknowledged at his deposition that to collect LPR data for DRN, Affiliates need only connect (or "plug in") cameras and download software:

> Q.     So the affiliate plugs the camera in, downloads the software, logs in to DRN's network, and they can immediately begin scanning LPR data . . . is that correct?
> A.     Yes.

[APP. 365].

20.     Thus, after DigitalDog first contracted with DRN in 2010, to get started using LPR cameras and capturing LPR data, DigitalDog:

- purchased (and, thereafter, owned) cameras made by Vigilant Solutions in California;
- mounted those cameras to trucks in California;
- connected those cameras to in-vehicle laptops in California;
- downloaded software (made by Vigilant Solutions in California) to automatically operate the cameras, scan license plates, and transmit the information to DRN; and,
- scanned license plates in California.

[APP. 506].

21.     When DigitalDog first started using LPR technology in January 2010, DRN had and offered "very little" training.  [APP. 430].  Approximately six months later, in July 2010, DRN hired Brett Balint to help manage DRN's relationship with Affiliates and to develop new training materials.  [APP. 428, 430].  The materials that Balint created covered "basic" information to operate LPR cameras and software used by Affiliates working with DRN, and to

navigate DRN's website. [APP. 437-38, 445-46].

22. Besides this basic operational information, DRN provides Affiliates with "high-level concepts" to collect LPR data. [APP. 429]. For example, Nethery testified that DRN provides "basic" information to repossession companies to help them effectively collect LPR data, such as scanning vehicles parked nose-to-bumper by driving in the right lane of the road:

> Q. [W]hat type of training does DRN provide to its affiliates?
> A. Specifically tied to optimizing . . . the collection of LPR scans [and] training? . . . How to scan -- how to place your vehicle as you're driving past a row of cars that are parked on the side of street that you may have thought you would have been able to actually capture those license plates, but just educating them on the fact, that, that, Hey, these cars are, you know, nose to bumper, but these cameras actually will pick up that plate even though there's a very narrow window. So as you're driving on your way to your next pickup and you see a group of cars on the side of the road, go to that right lane [and] scan them as you go by. I think that's an example.
> Q. Any other examples you can think of?
> A. No.

[APP. 375].

23. Nethery confirmed this training is voluntary, and that repossession companies, like DigitalDog, could successfully scan LPR data without completing it:

> Q. The training that DRN provides is voluntarily; is that accurate?
> A. Sure, yes.
> Q. Are there affiliates that are very successful at scanning LPR data who have not taken any training provided by DRN?
> A. I don't know.
> Q. Is it possible?
> A. [It's] possible.

[APP. 376-77, 506-07].

24. Having repossessed vehicles for more than a decade, by the time that DigitalDog signed the 2010 Agreement with DRN, DigitalDog already had significant institutional knowledge and general skills about how to locate vehicles subject to repossession. [APP. 506].

Eusebio recalled little, if any, training that DigitalDog received from DRN, and nothing that was more than basic information. *Id.* Rather, DigitalDog learned, and got better at using LPR technology through day-to-day operations in the field and developing its own methodologies.

25.      Balint recalled visiting DigitalDog's offices in California in the 2012-2014 timeframe allegedly to provide basic, general training, but he could not recall any specialized training provided to DigitalDog (other than "training" on how to comply with the terms of the non-confidential Affiliate Agreement). [APP. 437-39, 445-46, 447-49].

26.      DRN will at times annotate materials as confidential when DRN intends the material to be confidential. [APP. 456]. DRN has not identified any materials annotated as confidential that were provided to DigitalDog.[5]

### DRN Rolls Out New Contract in 2014

27.      In early 2014, DRN made changes to its business model, and in conjunction, required Affiliates (including DigitalDog) to sign a new Affiliate Agreement ("2014 Agreement") with different terms. DigitalDog received a draft of the 2014 Agreement on January 23, 2014. [APP. 154-87].

28.      Nethery had primary responsibility for drafting the new Affiliate Agreements [APP. 384-86], and all such agreements distributed to Affiliates were preprinted with Nethery's signature. [APP. 399-400, 406-07].

29.      Negotiations about the 2014 Agreement occurred between Eusebio, on behalf of DigitalDog, and Balint, on behalf of DRN. [APP. 154-87, 460-61, 436, 188-92, 472-73, 193-95, 197-225, 474-80, 226, 482-87, 333]. Throughout the entire negotiation period, both Eusebio and Balint resided in California. [APP. 424-27, 503, 507].

---

[5] The confidentiality markings on documents cited in the appendix (along with the Bates numbers) were added for the purposes of litigation; they were not part of the original documents.

30.     Eusebio, on behalf of DigitalDog and while he was located in California, executed the 2014 Agreement on June 30, 2014, with handwritten terms on the signature page, and then again on July 1, 2014, without the handwritten terms. [APP. 334-37, 406-10, 507]. Nethery did not personally sign the 2014 Agreement; his signature was preprinted. [APP. 399-400, 406-07].

31.     At the time DigitalDog executed the 2014 Agreement, DRN had contracts with other Affiliates in California and was conducting business in California. [APP. 027, 029-30]. DRN continues to conduct business in California, has a California-specific privacy policy on its website, and presented awards to California-based companies this year. [APP. 029, 372].

32.     The 2014 Agreement contains an expansive non-competition provision—the provision at the heart of this case—states as follows [APP. 010]:

11.     **Restrictions.**

        (a)     **Non-Competition.** As an inducement for DRN to enter into this Agreement, DRN Affiliate agrees that during the term of this Agreement and the Restrictive Period, neither DRN Affiliate nor, if DRN Affiliate is an entity, any Related Parties shall, directly or indirectly, engage or invest in, own, manage, operate, finance, control or participate in the ownership, management, operation, financing or control of, be employed by, associated with or in any manner connected with, or render services or advice or other aid to, or guarantee any obligation of, any person or entity engaged in or planning to become engaged in the business of using LPR technology and LPR data for the purpose of recovering vehicles sought for recovery within the financial, lending or insurance industries or assisting in debt collection efforts on behalf of municipalities and governmental entities. DRN and DRN Affiliate agree that this covenant is reasonable with respect to its duration and scope.

33.     Nethery testified that the purpose of the non-compete was to protect DRN's confidential information. [APP. 383, 401-02].

34.     Relative to the earlier days of the company, in the 2010 timeframe, Nethery testified that DRN has over time become less concerned about the dissemination of confidential

information. [APP. 390-92].[6] Yet, the non-compete in the 2014 Agreement is much broader than the non-compete in the 2010 Agreement.

35.     Unlike the 2010 non-compete, this non-compete applies to DigitalDog and "Related Parties," which includes the "officers, directors, employees, shareholders, members, partners, agents or other representatives" of DigitalDog. [APP. 003, 010]. Nethery confirmed that, under this definition, the non-compete applies to everyone from administrative assistants to janitors who work for DigitalDog. [APP. 397-98].

36.     Unlike the 2010 non-compete, Nethery also confirmed that DigitalDog employees who use skip-tracing techniques to locate vehicles, and who have never run LPR cameras in their careers, would be barred from performing skip-tracing services for any company that also offers LPR technology under this non-compete. [APP. 397, 508].

37.     Nethery admitted that the scope of this non-compete is "probably not" reasonable. [APP. 397-98].

### DigitalDog Connects with Location Services and Begins Business Negotiations

38.     Location Services was formed in the summer of 2017, when its principal investor, Delaware Street Capital ("DSC"), purchased and merged two smaller companies. [APP. 509-10]. One of the predecessor companies, PRA Location Services ("PRA") previously offered LPR technology, but with limited success. DRN's former CEO, Chris Metaxas, described PRA as "mostly insignificant." [APP. 523-24].

39.     In the fall of 2017 (and continuing through today), DSC began hiring a new management team of experienced repossession industry veterans to run Location Services,

---

[6] In a prior litigation, Nethery testified as DRN's corporate representative that DRN was "less concerned" about DRN's confidential information being disseminated in 2016 compared to 2010. [APP. 390-92]. At his deposition in this case, when Nethery was asked to confirm his prior testimony was truthful and accurate he replied "Yeah, I guess," and then attempted to recharacterize his prior testimony as meaning only that DRN was "in a better position" to handle the consequences of an Affiliate sharing confidential information. [APP. 392-93].

including, among other things, to grow its LPR offerings. [APP. 323-24, 509].

40.     Lee McCarty was hired as Location Services' new CEO in October 2017. [APP. 323, 509]. He has more than 30 years of experience in the repossession industry, from driving trucks and repossessing vehicles, to managing the recovery services for Ally Financial, one of the largest auto-finance lenders in the United States. [APP. 509-10].

41.     Immediately after his hiring, McCarty began meeting with various Lienholders and repossession agents to discuss their perspectives on the state of the industry. [APP. 324-25.] Through that process, in October 2017, he first met with Eusebio to understand "pain points" in the industry from the repossession agents' viewpoint. [APP. 253, 326, 329].

42.     Over time, the discussions between McCarty and Eusebio expanded into a business negotiation about a potential working relationship. [APP. 507]. In terms of LPR, their discussions focused on the basic parameters of a potential partnership, including the price of equipment, the fees paid to repossession agents, and the repossession agents' ability to search historical LPR data to help them repossess vehicles. [APP. 244].

43.     A draft proposal outlining the parameters was exchanged in December 2017. With those basic points addressed, and because the possibility of reaching some agreement seemed more realistic, Eusebio requested that, to move forward, Location Services indemnify DigitalDog against any potential legal action from DRN. [APP. 244].

44.     Location Services agreed to indemnify DigitalDog. Before moving forward, both parties analyzed the non-compete and the relevant law and concluded that any attempt by DRN to enforce the non-compete would ultimately fail, as is acknowledged in the indemnity agreement. [APP. 254-58, 507].

**DigitalDog Exercises Its Right to Terminate Its Contract with DRN and Files This Lawsuit**

45.     DigitalDog's 2014 Agreement with DRN provides that after a one-year "Initial Term" (which ended in 2015), the 2014 Agreement became terminable "by either party at any time for any reason upon thirty (30) days' prior written notice to the other party." [APP. 013].

46.     DigitalDog provided notice to DRN on April 11, 2018, that it was terminating the 2014 Agreement, acknowledging that termination would be effective thirty days later, on May 11, 2018. [APP. 242, 345-46].

47.     In its notice letter, DigitalDog disclosed its plans to work with Location Services post termination to use different LPR technology to collect different LPR data, confirmed that DRN materials would not be shared with Location Services, stated DigitalDog's belief that the non-compete is unenforceable under California law or Texas law, and asked DRN whether it would prefer to proceed under the 2014 Agreement for the following thirty days or have DigitalDog stop using LPR technology immediately. [APP. 242, 345-46].

48.     DigitalDog filed the instant suit on April 11, 2018. Doc. 1.

49.     On April 12, 2018, Eusebio sent an email to all DigitalDog employees announcing that DigitalDog planned "to start using LPR technology provided by Location Services" after the 2014 Agreement was officially terminated. [APP. 241, 343-44]. He further explained that, "[y]esterday afternoon, we notified DRN that DigitalDog will be terminating our existing agreement. To fully protect DigitalDog's rights, we also took the affirmative step of filing a lawsuit in federal court seeking an order that DigitalDog is free to terminate the 2014 Agreement, and to work with the LPR provider of its choosing going forward." *Id.* Eusebio cautioned his employees that "[i]t is important that you do not disparage DRN or speculate about the outcome of the lawsuit. Should you receive questions about DigitalDog's decision or the

16

pending lawsuit, please limit your response to basic factual information . . . ." *Id.*

50.     Since May 11, 2018, the date that the 2014 Agreement terminated, Location Services and DigitalDog have continued to discuss a potential relationship, both in terms of LPR and more broadly, including a potential acquisition.  [APP. 547-48].  Location Services and DigitalDog have also had limited conversations about DigitalDog's general experience with using LPR cameras in the field.  [APP. 511-13].  No definitive agreement between Location Services and DigitalDog has been finalized, and, given the pending litigation, DigitalDog has not used LPR technology or collected any LPR data since May 11, 2018, when its 2014 Agreement with DRN formally ended.  [APP. 508].

## IV.    SUMMARY JUDGMENT STANDARDS

The moving party has the initial burden of showing there is no genuine issue of material fact. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 256 (1986).  The movant may discharge this burden by pointing out the absence of evidence to support one or more essential elements of the non-moving party's claim "since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).  Once the moving party has carried its burden under Rule 56(c), the non-moving party must do more than merely show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The party opposing the motion may not rest on mere allegations or denials of pleading, but must set forth specific facts showing a genuine issue for trial. *Anderson*, 477 U.S. at 248, 256.  To meet this burden, the non-movant must "identify specific evidence in the record and articulate the 'precise manner' in which that evidence support[s] [its] claim[s]." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994).  An issue is material only if its resolution could affect the outcome of the action. *Anderson*, 477 U.S.

17

at 248. Unsupported allegations, conclusory in nature, are insufficient to defeat a proper motion for summary judgment. *Simmons v. Lyon*, 746 F.2d 265,269 (5th Cir. 1984).

## V. ARGUMENT AND AUTHORITIES

### A. The Non-Compete in the 2014 Agreement is Governed by California Law and Is Unenforceable as a Matter of Law

As a threshold matter to this *Motion*, this Court must decide if California or Texas law applies to the non-compete. If California law applies, this case is over: the non-compete is void, and DRN's counter- and third-party-claims fail. Although § 17(b) of the 2014 Agreement states that Texas law applies, choice-of-law provisions are not "unassailable," and parties regularly overcome them. *See Cardoni v. Prosperity Bank*, 805 F.3d 573, 581 (5th Cir. 2015) (collecting cases); *see also McKissock, LLC v. Martin*, Case No. 16-cv-400, 2016 WL 8138815, at *3 (W.D. Tex. Nov. 10, 2016) (explaining that "it is not uncommon for [choice-of-law provisions] to be defeated"). Texas courts, analyzing the enforceability of non-compete clauses, have routinely rejected choice-of-law provisions like § 17(b), and applied another state's laws instead:

- *ECL Grp., LLC v. Mass*, No. 3:17-CV-2399-D, 2018 WL 949235, at *7 (N.D. Tex. Feb. 20, 2018) (applying California law despite Texas choice-of-law provision);

- *Merritt, Hawkins & Assocs., LLC v. Caporicci*, No. 05-15-00851-CV, 2016 WL 1757251, at *3 (Tex. Ct. App. May 2, 2016) (applying California law despite Texas choice-of-law provision);

- *Cardoni v. Prosperity Bank*, 805 F.3d 573, 583 (5th Cir. 2015) (applying Oklahoma law despite Texas choice-of-law provision); and

- *Maxxim Med., Inc. v. Michelson*, 51 F. Supp. 2d 773, 780-81 (S.D. Tex. 1999), *rev'd on other grounds*, 182 F.3d 915 (5th Cir. 1999) (applying California law despite Texas choice-of-law provision).

Here too, the relevant analysis demonstrates that California law—not Texas law—governs the enforceability of the non-compete.

### 1. California Law Governs the Enforceability of the Non-Compete

In Texas, a choice-of-law provision is not controlling when the standards set forth in § 187(2) of the Restatement (Second) of Conflicts of Laws are satisfied. *See Cardoni*, 805 F.3d at 581; *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677 (Tex. 1990) (adopting Restatement § 187). Under § 187(2)(b), California law will govern the non-compete in the 2014 Agreement if: (1) California has a more significant relationship with the parties and the transaction at issue than Texas does under Restatement § 188; (2) California has a materially greater interest than Texas does in the enforceability of the non-compete; and (3) California has a fundamental policy that would be contravened by the application of Texas' law. *See Cardoni*, 805 F.3d at 582 (citing *Exxon Mobil Corp. v. Drennen*, 452 S.W.3d 319, 325-27 (Tex. 2014)). Because, in each instance, the answer is "yes," California law governs the non-compete in this case.

### a. California Has a More Significant Relationship with the Parties and the 2014 Agreement than Texas.

Courts must consider a number of factors to decide which state has the "more significant relationship," namely: (a) place of performance; (b) location of the subject matter of the contract; (c) place of negotiation of the contract; (d) place of contracting; and (e) domicile, residence, nationality, place of incorporation, and place of business of the parties. Restatement (Second) Conflicts of Laws § 188(2). "These contacts are weighed not by their number, but by their quality." *Cardoni*, 805 F.3d at 582-83. Here, the relevant California contacts (and their quality) far outweigh the relevant Texas contacts. Thus, California has a much more significant relationship than Texas with the parties and the 2014 Agreement.

### (i) Place of Performance.

The place of performance is the critical factor in determining which state's laws govern the enforceability of a contract. *See Cardoni*, 805 F.3d at 583 (concluding that place of performance in Oklahoma was "[m]ost significant" factor in determining that Oklahoma law

applied over Texas law); *DeSantis*, 793 S.W.2d at 678 ("[T]he gist of the agreement in this case was the performance of personal services in Texas. As a rule, that factor is alone conclusive in determining what state's law is to apply.").

The place of performance in this case was unquestionably California. DRN is a data company. [APP. 198, 359]. It sells LPR data to Lienholders. [APP. 359]. Because it does not have employees driving trucks or operating LPR cameras, DRN must contract with Affiliates, like DigitalDog, to collect LPR data on its behalf. [APP. 360]. Affiliates use LPR data (when made available) to help locate vehicles in order to repossess them. [APP. 341-42].

At all relevant times, from June 2014 to May 2018, DigitalDog collected LPR data for DRN and made repossessions only in the State of California—the single state where it is licensed. [APP. 028, 338, 503-05]. This was no secret to DRN; in fact, DRN *expected* DigitalDog to collect LPR data for it in California. DigitalDog submitted paperwork (its DRN Affiliate Profile) to DRN confirming that its operations were limited to California. [APP. 490-501, 505]. DRN relied on Affiliate Profiles to make business decisions and tracked how many Affiliates worked in a particular area. [APP. 515-16]. Nethery testified he expects the information Affiliates provide to accurately reflect where they operate, even if DRN does not independently verify that information. [APP. 516-17].

Even without the paperwork it submitted, DigitalDog's public website in May 2014 showed that its "coverage area" was limited to California cities. [APP. 305, 503]. DigitalDog provided a map of its coverage area for anyone, including DRN, to see. *Id.* DigitalDog's website continues to show that its coverage area is limited to California to this day. *See* https://www.digitaldog.us/repossession-coverage-area.php (last visited Aug. 21, 2018).

Even more, DRN representative Balint testified that he visited DigitalDog's offices in

California.  [APP. 439].  Conversely, there is no evidence that DigitalDog visited DRN's offices in Texas, worked in Texas or was ever expected to work in Texas.

The place of performance was clearly California; the whole purpose of the 2014 Agreement was to have DigitalDog collect LPR data (so that DRN could function as a business) and repossess vehicles in that state.  Because the place of performance is the "most significant" factor impacting the choice-of-law issue, the analysis effectively ends here.  But even if the other factors are considered, the result is the same: California law applies.

### (ii)    Location of the Subject Matter of the Contract.

The "subject matter" of the 2014 Agreement is tied to California.  The 2014 Agreement obligated DigitalDog to buy LPR cameras from DRN's California-based sister company, Vigilant Solutions, and scan a minimum of 10,000 license plates every month.  [APP. 005-06, 361-62].  The cameras DigitalDog purchased were mounted to trucks and operated by drivers in California.  [APP. 505-06].

DRN is a middleman in camera transactions.  It technically buys cameras from Vigilant Solutions (through some form of intra-company transaction) and resells them to DigitalDog and other Affiliates at inflated prices.  [APP. 362].  But Vigilant Solutions ships the cameras directly to Affiliates, which means, in this case, that the LPR cameras were developed in California, and shipped from Vigilant Solutions in California to DigitalDog in California.  [APP. 362, 412, 455].

The 2014 Agreement also granted DigitalDog certain rights to access the "DRN System," which the 2014 Agreement defines as follows:

> [T]he DRN Car Detector [software], DRN WebRepo [software], the DRN Portal, the DRN Intellectual Property Rights, and all other equipment, software, hardware, materials and information provided by DRN to [DigitalDog] pursuant to this Agreement, including all enhancements, upgrades, improvements, changes, modifications, revisions or derivative works made to same from time to time.

[APP. 001-02, 004].  But any LPR software licensed to DigitalDog, which also was developed

by Vigilant Solutions, was downloaded to computers in, and operated from, California, to collect LPR data and make repossessions in that state. [APP. 363-64, 370, 505-06]. And, DigitalDog used the LPR cameras (that it bought and owned) and software (that it licensed) to collect LPR data for DRN only in California. *See supra* at § V.A.1.a.(i). DRN knew in 2014 for many reasons that DigitalDog operated only in the State of California, and it cannot make any good faith argument to the contrary. Again, this factor strongly favors California.

### (iii)     Place of Negotiation of the Contract.

DigitalDog negotiated the 2014 Agreement from California. Eusebio was the only DigitalDog employee involved. [APP. 507]. He had phone calls and exchanged emails with Balint, as summarized below:

- **January 23, 2014:** DRN emailed DigitalDog a draft of the 2014 Agreement, stating that DigitalDog should contact its "Affiliate Representative" with any questions. [APP. 154, 459-60]. DigitalDog's affiliate representative was Balint, who resided in California. [APP. 436]. The draft 2014 Agreement was electronically pre-signed by DRN. [APP. 399-400, 406-07].

- **February 25, 2014:** DRN emailed DigitalDog, reminding it to sign the 2014 Agreement. [APP. 192]. Eusebio responded to Balint, explaining that he "ha[dn't] signed the contact [sic] yet for several reasons," including that he had "questions and concerns" about the new contract." [APP. 191, 472-73].

- **February 25, 2014 to March 6, 2014:** Eusebio and Balint exchanged a series of emails, and participated in a conference call, regarding the terms of the 2014 Agreement. [APP. 193-95, 197-202, 474-78]. This included Balint rejecting Eusebio's attempts to strike out portions of the non-compete. [APP. 200, 212].

- **June 9, 2014:** Balint emailed Eusebio to inquire when DigitalDog would sign the 2014 Agreement. He reminded Eusebio that DRN was withholding money from DigitalDog until it signed. [APP. 226, 479-80].

- **June 30, 2014:** Eusebio signed the 2014 Agreement, and DigitalDog sent it to DRN. The signature page included a handwritten note that DRN must pay DigitalDog certain monies DRN was withholding or the contract would be void. [APP. 482-83, 333].

- **July 1, 2014:** Balint asked Eusebio to remove the handwritten note before DRN would "consider this contract valid." *Id.* He identified two "permitted alterations" to the

contract that DRN would accept. *Id.* Eusebio signed a clean signature page in California, and send it to Balint.[7]  [APP. 484-87, 507].

Eusebio communicated with Balint from California.  [APP. 507].  Balint resided in California but split his time between traveling in his territory (which was the western half of the United States, and not Texas) and working from California. [APP. 427, 434-35, 468-69]. Balint did not remember exactly where the negotiations with DigitalDog took place because "he was traveling a great deal" at that time. [APP. 434-35, 468-69].  Balint speculated that he may have been in Texas, at DRN's headquarters, at points during the first quarter of 2014, but he could not specifically recall his whereabouts. [APP. 461-62, 469-71].  He testified that the only way to confirm his location on any given date would be to check his calendar and his travel expense records. [APP. 461-62, 470-71, 476].  Location Services has requested that DRN produce this information, but DRN has not produced calendar entries sufficient to show where Balint was located during his negotiations with DigitalDog, and DRN refuses to produce any of Balint's travel expense records that would reflect his location during negotiations. [APP. 306-07].

In discovery, DRN identified two other employees that allegedly were involved in negotiating the 2014 Agreement.  The first, DRN executive Nethery, who resided in Texas at the time, had primary responsibility for drafting the general form of the Agreement sent to every Affiliate, as opposed to negotiating with DigitalDog. [APP. 033, 384-86].  Nethery testified that his participation with DigitalDog, if anything, would have been limited to communicating internally with Balint about DigitalDog's delay in signing. [APP. 378, 387-88].  Balint, for his part, did not recall Nethery being involved in any communications with DigitalDog. [APP. 471].

DRN also claims that its former CEO, Chris Metaxas, made "a presentation regarding the changes to the agreement at a meeting in Dallas which, upon information and belief, was

---

[7] In September 2014, Eusebio re-signed and resent the Affiliate Agreement to DRN, but Nethery confirmed that the terms material to his case were the same. [APP. 411, 259-81].

attended by DigitalDog and Eusebio." [APP. 033]. Metaxas could not remember what meeting that was: an October 2013 Affiliate Summit, or a meeting at a March/April 2014 industry conference. [APP. 528, 533]. DRN's own documents indicate that neither Eusebio nor anyone else from DigitalDog attended that October 2013 Summit. [APP. 235, 240, 506]. Eusebio's absence from the October 2013 meeting is confirmed by his testimony that he did not recall ever "having a meeting in Texas with DRN about the affiliate agreement."[8] [APP. 340].

On the existing record, the evidence shows that the gravamen of the actual "negotiations" between DRN and DigitalDog—i.e., the exchange of proposals and counter-proposals regarding the terms of the 2014 Agreement—occurred between Balint and Eusebio via email and telephone during a period when both men resided in California. Only Eusebio's actual whereabouts can be confirmed, and he was in California. Even if Balint had been in Texas for part of the negotiations, or Eusebio had attended a presentation by Metaxas during an industry tradeshow, those facts would not tip the balance of this factor toward Texas. *See Cardoni*, 805 F.3d at 583 (holding that Oklahoma law governed despite Texas choice-of-law provision in part because "*[m]ost* of the negotiations took place in Oklahoma" (emphasis added)); *Maxxim*, 51 F. Supp. 2d at 780-81 (holding that California law governed despite Texas choice-of-law provision where negotiations occurred in both California and Texas). This factor favors California.

### (iv) Place of Contracting.

The "place of contracting" is where the final signature is affixed to render the contract binding. *See ECL*, 2018 WL 949235, at *6 (quoting Restatement § 188 cmt. e for proposition

---

[8] When asked about Metaxas' presentation identified by DRN, Balint testified that he attended the presentation and remembered speaking with Eusebio about the affiliate agreement while there. [APP. 463-65]. But Balint also testified that he believed the presentation occurred at the 2014 annual NARS (North American Repossession Summit) conference. [APP. 462-67]. Eusebio, who has attended "most of the NARS conferences," testified that he did not "recall sitting down and talking to anyone" regarding the affiliate agreement while at the 2014 NARS conference. [APP. 340]. Accordingly, the only reasonable inference is that while Balint may have seen Eusebio at the 2014 NARS conference, he did not see Eusebio at the October 2013 meeting where the affiliate agreements were specifically discussed.

that "the place of contracting is the place where occurred *the last act necessary*, under the forum's rules of offer and acceptance, to give the contract binding effect" (emphasis added)).

DRN's signature (by Nethery) was pre-printed on the initial draft of the Agreement sent to DigitalDog in January 2014. [APP. 399-400, 406-07]. Eusebio signed in California [APP. 507], and his was the "final signature[] . . . affixed" to the contract. *Cardoni*, 805 F.3d at 583. As such, this is another factor favoring California.

### (v)    Domicile, Residence, Nationality, Place of Incorporation, and Place of Business of the Parties.

DRN is a Delaware corporation with headquarters in Fort Worth, Texas, but it conducts (and conducted in 2014) business nationwide, including in California. Doc. 7 at ¶ 11; Doc. 18 at ¶ 11; [APP. 358, 372, 027, 029-30]. For example, DRN's website includes a "California Automated License Plate Recognition System Usage and Privacy Policy." [APP. 029]. Throughout 2014, including when the 2014 Agreement was executed, DRN employed Balint, a California resident. [APP. 027, 372-73, 412, 424-27]. In 2014, DRN had contracts with repossession agencies other than DigitalDog that were also based in California. [APP. 027]. In fact, DRN presented awards to its repossession agents this year, and the "Big Picture Award" and "Top Gun Western Region" awards went to California companies. [APP. 029]. And, as described above, DRN's sister company Vigilant Solutions, which develops DRN's LPR camera kits and related software, and actually ships the LPR cameras directly to DRN Affiliates, is based in California. *See supra* at § V.A.1.a.(ii).

Unlike DRN, which has a national corporate presence, DigitalDog is localized to California: it is a California corporation with headquarters in El Dorado Hills, California. [APP. 339, 502]. DigitalDog's 84 employees, working at thirteen California locations (in addition to the corporate headquarters), service more than 400 cities throughout California. [APP. 503].

DigitalDog does not have a corporate presence in any state other than California. *Id.*

At most, the mere fact that DRN is "home" in Texas is "cancelled out" for purposes of the choice-of-law analysis by DigitalDog's residence in California. *Cardoni*, 805 F.3d at 583; *see also Merritt*, 2016 WL 1757251, at *2, 4 (affirming that California law governed despite Texas choice-of-law provision where appellant was headquartered in Texas while appellees and appellant's parent company were located in California); *Maxxim*, 51 F. Supp. 2d at 780 (holding that California law governed despite Texas choice-of-law provision where domiciles, residences, nationalities, places of incorporation, and places of business of parties were split between California and Texas). This factor also favors California.

*     *     *

Considering all relevant factors, California has a "more significant relationship" with the parties and the 2014 Agreement than Texas.

        **b.**    **California has a materially greater interest than Texas in the enforceability of the non-compete.**

Because the non-compete at issue here impacts DigitalDog and its employees—84 California residents—California has a materially greater interest than Texas in the enforceability of the non-compete. [APP. 503]. Nethery confirmed that the non-compete applies to everyone from administrative assistants to janitors who work for DigitalDog. [APP. 397-98]. In *Cardoni*, a factually on-point decision, the Fifth Circuit ruled that Oklahoma had a greater interest than Texas in the enforceability of a non-compete between a Texas-based bank (Prosperity) and several of the bank's former employees, given that: the employees resided in Oklahoma; Prosperity operated in Oklahoma; the competing bank that wanted to hire the employees was headquartered in Oklahoma; and the customers of the competing bank were located in Oklahoma. *See* 805 F.3d at 584.

The facts here are nearly identical (replacing Oklahoma with California): DigitalDog is

26

headquartered and operates exclusively in California; DigitalDog's 84 employees—all of whom are covered by the non-compete at issue—live and work in California; during the relevant period, Balint, the DRN employee responsible for managing the DigitalDog relationship, and who had the most extensive contact with DigitalDog, resided in California; DRN's sister company, Vigilant Solutions, which makes the LPR hardware and software sold by DRN and used by DigitalDog, is based in California; and Location Services, the company with which DigitalDog wishes to partner, is headquartered in California. *See supra* §§ V.A.1.a.; Doc. 18 at ¶ 3; [APP. 317]. Consequently, following *Cardoni*, California has a materially greater interest in the enforceability of the non-compete than Texas.

Although the *Cardoni* court acknowledged that Texas had a generalized "interest in enforcing parties' contractual expectations and . . . enforcing an agreement made by a company based in the state," it concluded that Oklahoma's countervailing interests prevailed, given the greater number of "affected parties within [Oklahoma's] borders." *See id.* (discussing *DeSantis*, 793 S.W.2d at 680); *see also Merritt*, 2016 WL 1757251, at *3; *ECL*, 2018 WL 949235, at *7. Similarly, because the parties affected by the non-compete at the center of this dispute reside and operate solely within the geographical borders of California, this Court should likewise hold that California has a greater stake in this case than Texas.

### c. California's fundamental policy disfavoring non-competes would be contravened by the application of Texas law.

Texas courts recognize California's strong public policy against the enforcement of non-competition covenants like that at issue here. *See, e.g., Merritt*, 2016 WL 1757251, at *4; *Maxxim*, 51 F. Supp. 2d at 780-81. Indeed, California proscribes such agreements by statute: "[Barring limited exceptions not applicable here], every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Cal.

Bus. & Prof. Code § 16600. In contrast, "Texas law permits non-competition covenants to the extent that they are reasonable and ancillary to an otherwise enforceable agreement." *Maxxim*, 51 F. Supp. 2d at 781; *see also ECL*, 2018 WL 949235, at *8 ("Texas . . . has adopted a more tolerant approach to restrictive covenants: an agreement not to compete is enforceable, provided it is reasonable."); *cf. Cardoni*, 805 F.3d at 586 ("[A]pplying Texas law, which takes a more permissive attitude of both non-competition agreements and the ability to reform them, would contravene Oklahoma's statutory aversion to non-competition agreements.").

Applying Texas law in this case to enforce the non-compete would contravene California's fundamental public policy, as prior courts have recognized. *See ECL*, 2018 WL 949235, at *8 ("The court thus concludes that the application of Texas law, based on Texas policy concerns, to [plaintiffs'] contract claims would contravene California's own policy regarding restrictive covenants in employment agreements."); *Maxxim*, 51 F. Supp. 2d at 781 ("[I]f this Court were to apply Texas law, California's public policy in preventing broad non-competition covenants would be contravened.").[9]

For all these reasons, this Court should apply California law—not Texas law—in determining the enforceability of the non-compete.

## 2. Under California Law, the Non-Compete is Unenforceable as a Matter of Law

California's § 16600 states, in no uncertain terms, that apart from certain limited exceptions not applicable here, "*every contract by which anyone is restrained from engaging in a lawful profession, trade or business of any kind is to that extent void.*" Cal. Bus. & Prof. Code § 16600 (emphasis added). "California courts have repeatedly held that section 16600 should be interpreted as broadly as its language reads." *Scott v. Snelling & Snelling, Inc.*, 732 F.

---

[9] To be clear, and as explained below, the non-compete is also invalid under Texas law. Under California law, however, the non-compete is *per se* invalid.

Supp. 1034, 1042 (N.D. Cal. 1990). Section 16600 serves the policy of "protect[ing] the important legal right of persons to engage in businesses and occupations of their choosing." *Artec Grp. v. Klimov*, No. 15-cv-03449-EMC, 2016 WL 8223346, at *2 (N.D. Cal. Dec. 22, 2016). Accordingly, courts applying Section 16600 have refused to enforce even "reasonable" non-competition clauses. *See Scott*, 732 F. Supp. at 1042; *Aussie Pet Mobile, Inc. v. Benton*, No. SACV 09-1407, 2010 WL 2629556, at *6 (C.D. Cal. June 28, 2010). In short, section 16600 voids any restraint on the ability to compete after an agreement terminates. *See Artec*, 2016 WL 8223346, at *2 (collecting cases).

The non-compete at issue here is exactly the type of broad restraint that is *per se* illegal under California law. It purports to bar DigitalDog and all DigitalDog employees, for one year after termination of the 2014 Agreement, from **directly or indirectly**, anywhere in the world:

- **owning, managing, operating, controlling, investing in, or financing** any person or entity engaged in, or planning to become engaged in, the business of using LPR technology and LPR data for the purpose of recovering vehicles sought for recovery within the financial, lending or insurance industries;

- **being employed by, associated with, or in any manner connected** with any person or entity engaged in, or planning to become engaged in, the business of using LPR technology and LPR data for the purpose of recovering vehicles sought for recovery within the financial, lending or insurance industries; and

- **rendering services, advice, or other aid** to any person or entity engaged in, or planning to become engaged in, the business of using LPR technology and LPR data for the purpose of recovering vehicles sought for recovery within the financial, lending or insurance industries.

[APP. 010 (emphasis added)]. On its face, the non-compete is void under § 16600. Under the clear language of § 16600, the Court should find the non-compete invalid under California law.

## B.  The Non-Compete is Also Unenforceable Under Texas Law

For the reasons stated above, California law governs the non-compete, and it is void under California law. However, the non-compete is also unenforceable under Texas law. There

is no business justification for the non-compete, and it is overbroad and unreasonable as written.

### 1. Legal Framework

"Covenants not to compete are generally considered restraints of trade and are disfavored in law." *Valley Diagnostic Clinic, P.A. v. Dougherty*, 287 S.W.3d 151, 156 (Tex. App. 2009); *see also Zep Mfg. Co. v. Harthcock*, 824 S.W.2d 654, 658 (Tex. App. 1992) ("Courts generally disfavor noncompete covenants because of the public policy against restraints of trade and the hardships resulting from interference with a person's means of livelihood."). They must comply with § 15.50 of the Texas Business and Commerce Code, which states that:

> Notwithstanding Section 15.05 of this code, and subject to any applicable provision of Subsection (b), a covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

Tex. Bus. & Com. Code Ann. § 15.50 (West).

Thus, non-competes are enforceable in Texas only if they are "(1) ancillary to or part of an otherwise enforceable agreement at the time the agreement is made and (2) reasonable, not imposing a greater restraint than is necessary to protect the goodwill or other business interest of the employer." *Neurodiagnostic Tex, L.L.C. v. Pierce*, 506 S.W.3d 153, 163 (Tex. App. 2016). DRN has the burden to prove both elements. *Allan J. Richardson & Assocs., Inc. v. Andrews*, 718 S.W.2d 833, 835 (Tex. App. 1986). If a non-compete is ancillary to or part of an otherwise enforceable agreement, but unreasonable, "the Court shall reform" the provision to make it reasonable. Tex. Bus. & Com. Code Ann. § 15.51(c) (West).

"Whether a covenant not to compete is a reasonable restraint of trade is a question of law for the court." *Philip H. Hunke, D.D.S., M.S.D., Inc. v. Wilcox*, 815 S.W.2d 855, 857 (Tex. App.

1991), *writ denied* (Feb. 26, 1992). "In answering this question, however, the trial court must examine the factual circumstances of each case." *Id.* In this case, based on this record, DRN has not met its burden to show that the non-compete is necessary or reasonable.

### 2. The Non-Compete is Unnecessary; It does not Protect a Legitimate Business Interest

The Court should invalidate the non-compete in the 2014 Agreement. DRN has not met its burden to show that the non-compete is "ancillary to or part of an otherwise enforceable agreement at the time the agreement is made." *Neurodiagnostic Tex*, 506 S.W.3d at 163. It was required to establish both that "(a) the consideration given by the employer in the agreement is reasonably related to an interest worthy of protection and (b) the covenant not to compete was designed to enforce the employee's consideration or return promise in the agreement." *Id.* at 163-64. "Business goodwill and confidential or proprietary information are examples of interests that can be, in appropriate circumstances, worthy of protection by a covenant not to compete . . . [but] . . . the [non-compete] must be designed to enforce the return promises made by the employee." *Gorman v. CCS Midstream Servs., L.L.C.*, No. 12-09-00204-CV, 2011 WL 1642624, at *3 (Tex. App. Apr. 29, 2011). Here, DRN claims that the non-compete was designed to protect its confidential information, which it claims will be lost if DigitalDog and Location Services work together:[10]

| Q. | Do you believe that DRN will be harmed if DigitalDog is allowed to work with Location Services? |
|---|---|
| A. | Yes. |
| Q. | In what way? |
| A. | Sharing confidential information they've learned while being an affiliate of DRN with Location Services. |
| Q. | Anything else? |
| A. | That's all I can think of at the moment. |

---

[10] Notably, when asked why the non-disclosure provision in the 2014 Agreement is insufficient to protect DRN's confidential information, Nethery said he did not know why. [APP. 383].

31

[APP. 401; *see also* APP. 36-37, 383]. But DRN has failed to show that it ever provided truly confidential information to DigitalDog.

Alternately, DRN contends it builds up goodwill by providing "specialized training and instruction" to Affiliates to improve their efficiency and utilization of LPR technology. [APP. 36-37.] But DRN has not identified evidence that it provided any such training to DigitalDog. The limited—and optional—training materials that DRN generally made available covered basic concepts, like "scan apartment complexes or malls on Black Friday since there's lots of cars." Balint admitted this type of training covered general information that Affiliates could pick up based on their day-to-day experiences. In fact, because DRN had no trucks or employees operating in the field, DRN learned how LPR data was efficiently or optimally collected from what it was told by Affiliates, not the other way around. And, to the extent that DRN offers training materials specific to operating its LPR system (e.g. software), any Affiliate terminating its contract with DRN loses access immediately, and the training has no residual value.

### a. The information DRN provided to DigitalDog was not confidential.

Location Services served an interrogatory (Interrogatory No. 2) requesting that DRN identify the allegedly confidential information it provided to DigitalDog that justifies the non-compete, and identify when, how, and to whom any such information was provided. [APP. 033-35]. In response, DRN failed to show that any information it identified as "confidential" was protected as such by DRN. While DRN would at times annotate documents "confidential" when it considered the material sensitive [APP. 456], no documents DRN identified in its interrogatory response are labeled or otherwise marked "confidential." [*See, e.g.*, APP. 033-35, 458].

Further, DigitalDog specifically asked DRN to produce documents sufficient to show (a) DRN's policies and procedures regarding the . . . protection of DRN's trade secrets and/or

confidential information, and (b) communications regarding the same. [APP. 047-48]. DRN has refused to produce any such information. *Id.* Thus, DRN should be precluded from arguing it has put policies or procedures in place to protect the confidentiality of its materials. *See* Fed. R. Civ. P. 37(a)(4), 37(c)(1). Because DRN did not identify any materials marked "confidential," and it has no policies or procedures to protect its confidential information, DRN has no evidence to support its claim that anything identified in response to Interrogatory No. 2 is confidential.

To the contrary, the record shows information DRN identified in response to Interrogatory No. 2 was publicly available.[11] [APP. 033-35]. For example:

***Names of Forwarding Companies.*** DRN states that the identity and contact information of its forwarding company customers "confidential." [APP. 035]. DRN advertises this information on its website:



*See* https://www.drnrecovery.com/providers/ (last visited Aug. 18, 2018); [APP. 251-52]. Balint also confirmed that he does not believe that forwarding companies—who work directly with

---

[11] Location Services filed a motion to compel (that is currently pending) because DRN is refusing to produce information it has publicized (and because Location Services has reason to believe DRN is withholding evidence showing that it publicized information that it has identified as "confidential" in support of the non-compete). Docs. 46, 47. In it, Location Services showed that DRN's response to Interrogatory No. 2 listed an aiming guide that is publicly disclosed on YouTube (Doc. 46 at 10-12), a "Target Density Map" that DRN published in a prior litigation (*id.* at 12-13), and allegedly "specialized training" that DRN discusses in public forums (*id.* at 13-14). The examples in the motion to compel were merely illustrative, not exhaustive.

repossession agents—would keep their contact information confidential from repossession agents. [APP. 450]. Nor does it make sense for DRN to claim that contact information for third-party forwarding companies (which are free to give that information to anyone they please) is DRN's confidential information.

*Identity of DRN Affiliates*. DRN states that the identity of its Affiliates is "confidential." [APP. 035]. Balint testified that not only is the identity of DRN Affiliates not confidential, but DRN wants its Affiliates to promote that very fact:

> Q.   During the term of your employment, did you consider the identity of affiliates working with DRN to be confidential?
> A.   Not that I'm aware, no.
> Q.   Are affiliates, in fact, allowed to publish on their website
> that   they're working with DRN?
> A.   From my recollection, part of the affiliate agreement would be, yes, we -- they could put out they are a DRN affiliate.
> **We   wanted them to promote that**, market that to their clients.

[APP. 440 (emphasis added)].

*Access to Mapping Software*. DRN identified "access to ClearPlan" and "integration of DigitalDog's historical authorized hits into ClearPlan" as confidential information provided to DigitalDog. [APP. 034]. ClearPlan is a third-party software company that provides a mapping program for repossession agents (notably, a program that DigitalDog *has never used*). [APP. 389, 506]. Nethery confirmed that ClearPlan is not DRN confidential information:

> Q.   What mapping program did [DRN have]?
> A.   . . . [W]hen DigitalDog approached us about RepoRoute, we had already been working with ClearPlan.
> Q.   ClearPlan is a third-party program, correct?
> A.   Correct.
> Q.   . . . [T]he ClearPlan program is not confidential DRN information, is it?
> A.   No.

[APP. 389]. Moreover, ClearPlan publishes numerous videos that explain in detail its software,

34

how it works, and how it integrates with DRN.[12]

**Target Density Map**. DRN identified the "layout and information provided via the Target Density Map" as confidential information provided to DigitalDog. [APP. 035]. The Target Density Map generally shows LPR scan volumes (or density) for a specific region. That information is available on this Court's public docket:



Case No. 4:14-cv-903 (N.D. Tex.), Doc. 103-1 at 209.[13]

**LPR Camera Aiming Guides**. DRN identified the LPR camera aiming guides as confidential information provided to DigitalDog. [APP. 034]. Aiming guides are simply instructions on how to aim LPR cameras that are shipped from Vigilant Solutions to repossession agents when they purchase an LPR kit for around $13,000. [APP. 455]. The underlying information was developed by Vigilant Solutions and simply "repurposed" with DRN letterhead.

---

[12] *See* https://www.youtube.com/channel/UCvesuUpdfvqivQxgdlUkhBQ/videos (last visited Aug. 21, 2018).

[13] Further, DRN claims that the "tools" that it provides to improve Affiliates' operational efficiencies includes the "Target Density Map." [APP. 36-37]. The Target Density Map generally shows LPR scan volumes (or density) for a specific region. DRN's former CEO Metaxas testified that the Target Density Map provided unreliable information and was ultimately scrapped. [APP. 525-26]

[APP. 451-55]. Balint confirmed his belief that the aiming guides—the exact same aiming guides that DRN identified in its interrogatory response—were in fact not confidential:

> Q. Do you have any understanding if the company intended to keep this information confidential or considered it confidential?
> A. It's not annotated as such. I don't think so.

[APP. 456]. Nethery testified that Vigilant Solutions sells LPR cameras to repossession agents working with DRN's largest competitor—MVTrac. [APP. 403-05, 421]. Presumably, Vigilant Solutions then ships the same aiming guide information to MVTrac affiliates.[14] Additionally, Nethery confirmed that Vigilant Solutions sells what he believes to be the same LPR cameras to law enforcement agencies. [APP. 367]. Again, the same aiming guide information is presumably provided to law enforcement agencies, who are likely not under any obligations to keep such information confidential. So far, Vigilant Solutions—using DRN's same counsel— has not just refused to provide any discovery that would allow Location Services and DigitalDog to explore these developments, but it filed a motion to quash an initial subpoena.[15] Doc. 40.

Slides from the aiming guides are published in a Vigilant Solutions video entitled "How to Aim your Vigilant 16 or 25mm Mobile LPR cameras." *See* https://www.youtube.com/watch?v=OzWEIc-CiJ8 (last visited Aug. 18, 2018).[16] Plainly, aiming guides are not the type of information that is treated as or considered confidential. Besides, DigitalDog spent more than $200,000 to purchase LPR cameras, which it now owns, under its contracts with DRN. [APP. 508]. It is unreasonable to assert that basic operational information

---

[14] After learning this new information at Nethery's deposition, Location Services requested that Vigilant Solutions (represented by the same counsel as DRN) provide discovery, including documents and a corporate witness, to explore whether the alleged confidential information that DRN claims necessitates the non-compete to prevent disclosure to DRN's competitors is in fact being directly provided to DRN's largest competitor. [APP. 309-12].
[15] After Nethery's deposition and Vigilant Solution's subsequent refusal to voluntarily provide the requested discovery, Location Services served a second subpoena on Vigilant Solutions.
[16] Location Services has forensically downloaded the video and can provide a copy of the video to the Court at its request in whatever format is convenient for the Court.

about those cameras is proprietary to DRN, and that such information justifies a one-year industry-wide ban for all DigitalDog employees.

*LPR Software Startup Guide*. DRN identified a Startup Guide for CarDetector software as confidential information provided to DigitalDog. [APP. 034]. DRN's CarDetector Mobile[17] is software developed by Vigilant Solutions, and is even co-branded with Vigilant Solutions. [APP. 363-64; APP. 071]. CarDetector Mobile is provided not just to DRN Affiliates but also law enforcement agencies. [APP. 367-68]. Nethery, who is a DRN employee but also works for Vigilant Solutions, testified that he is unaware of any specific differences between CarDetector used by repossession agents and CarDetector used by law enforcement agencies (other than there might be timing differences on how quickly the software updates, and the colors are different). [APP. 353, 368-69]. Presumably, law enforcement agencies under no confidentiality obligations using the CarDetector software are given the same Startup Guides.[18] Metaxas confirmed that a version of CarDetector Mobile is provided to DRN's largest competitor—MVTrac, and that he had no concerns about MVTrac affiliates using the software. [APP. 527; APP. 533-34].

The Startup Guide provides basic information about installing and using the software. [APP. 071-142]. In any case, Nethery confirmed that after an Affiliate leaves DRN, the Affiliate no longer has access to the CarDetector software, meaning that any training specific to CarDetector software has no value to the Affiliate after leaving DRN:

> Q. Some of the training is directed to using software that DRN provides to affiliates. . . . That software is only available to the affiliates while they are under contract with DRN, correct?
> A. Correct.
> Q. If an affiliate leaves DRN, they no longer have access to the CarDetector, the WebRepo, or the portal at the time?
> A. Correct.

---

[17] The word "Mobile" is to contrast the software with stationary LPR cameras (e.g., those attached to poles) because the CarDetector Mobile software is used with LPR cameras attached to cars. It is not a reference to cell phones.
[18] Vigilant Solutions has so far refused to produce any discovery.

> Q. So the training that you provide specific to DRN software has no residual value one an affiliate terminates their relationship with the company?
>
> A. I guess you could say that.

[APP. 374].

*     *     *

DRN has not identified any evidence showing that it provided DigitalDog with confidential information.[19]

### b. DRN provided no specialized training or instructions to DigitalDog to build up goodwill

Besides protecting confidential information, DRN alleges that the non-compete is justified because DRN provides Affiliates, including DigitalDog, with specialized training to improve their efficiency and use of LPR technology that, in turn, increases DRN's goodwill. [APP. 36-37.] But DRN has failed to make any showing that it provided DigitalDog with specialized training.

While DRN identified a handful of emails from the 2010-2013 timeframe suggesting that DRN provided DigitalDog with some sort of training [APP. 034-35], DRN has identified nothing to suggest that DigitalDog received any training after signing the 2014 Agreement. *See Gorman*, 2011 WL 1642624, at *4 (explaining that a non-compete must be supported by consideration but "[p]ast consideration is insufficient"). Eusebio does not recall any training that DRN provided to DigitalDog after the 2014 Agreement was executed. [APP. 507]. As to the 2010-2013 timeframe, DRN witnesses have been unable to describe any specialized training provided to

---

[19] Further, evidence in the record contradicts DRN's claim that certain information it identified in its interrogatory response was even provided to DigitalDog. For example, DRN identifies "[t]he detection data, images, optical character recognition interpretation metadata, date metadata, time metadata hotlist data, hit data and gps tracking data stored and password-protected on the database provided within DRN's proprietary CarDetector Mobile software on DigitalDog's laptops. . . ." [APP. 033-34]. But Nethery confirmed that while that information may have, in a technical sense, been on DigitalDog's laptop for a brief period of time, DigitalDog did not actually have access to any of that information. [APP. 370-71].

DigitalDog, nor is any specialized training described in DRN's interrogatory responses. [APP. 034-37].

Balint testified that when he joined DRN in July 2010, the company had "very little" training materials and that he was responsible for helping develop training materials. [APP. 430].[20] While Balint testified that he provided some training to DigitalDog in the 2010-2013 timeframe, that training, if it occurred, was directed to generalized, basic training on how to use LPR systems:

> Q.  In the subject line you reference, "DRN webinar with DigitalDog." Do you see that?
> A.  Yes.
> Q.  What does that refer to?
> A.  That's for, as mentioned previously, just training materials and to go over a **basic training** how to use the system.
> [ . . . ]
> Q.  What does that mean, "explained the system"? What would that have covered?
> A.  As mentioned previously, **basics on how the DRN system works**, how WebRepo works, how to upload assignments, how the camera works, how OCR works.
> [ . . . ]
> Q.  Why did you refer to those training as -- those videos as basic training?
> A.  There are times when we -- I would do additional training that is **just higher concepts** and trying to get -- you'll see here we got to a point of saying, hey, recognize how many hits you're having per thousands of scans and some of that was not always relatable to the driver in the field. That was more of an operational and an owner type of conversation.
> Q.  So the videos available for the web portal provided basic training information; is that correct?
> A.  Some of them are driver level and some of them are owner, manager level.
> Q.  **In both instances, was it basic training information?**
> A.  **Yes.**
> Q.  I mean, we talked earlier about DRN 101. You understand that 101 is generally used to indicate --

---

[20] This makes sense because DRN does not own trucks, or have employees scanning license plates in the field. [APP. 360]. Anything DRN learned about how to collect LPR data would have come from repossession agents in the field, not from DRN.

> A. Yes.
> Q. -- basic-level education or training or information; correct?
> A. Yes.
> Q. And that's why you used it, ***DRN 101 reflective that this is basic information about the process***?
> A. ***Yes***.

[APP. 437-38, 445-46 (emphasis added)].

DRN suggests that it may have at some point provided basic information like the location of apartment complexes or generalized advice about other locations where vehicles subject to repossession may be located. But Balint confirmed that none of this information is confidential or specialized:

> Q. You mentioned that as part of the target density map, DRN would identify the location of apartment complexes; is that correct?
> A. Yes[.]
> Q. And the location of apartment complexes is not confidential information to DRN, right?
> A. Correct.
> Q. You can pull that information up on a Google map?
> A. Correct.
> Q. And with respect to honey holes, the concept of scanning at a mall on Black Friday, is that proprietary or confidential information that DRN maintained?
> A. No.
> Q. Is that general experience gained in the field, understanding where high scan areas are and aren't?
> A. Yes.

[APP. 444].

DRN cannot claim that basic, generalized training justifies a non-compete. *See Philip H. Hunke*, 815 S.W.2d at 858 ("A former employee is entitled to freely use general knowledge, skills and experience acquired during his employment to compete with his former employer."); *Evan's World Travel, Inc. v. Adams*, 978 S.W.2d 225, 231 (Tex. App. 1998) ("It appears that the training provided to Adams by Evan's Travel covered general housekeeping functions which, although necessarily individualized from one business to another, do not rise to the level required

in order for one to perform the core job duties expected which should be protected by restrictive covenants."); *Lazer Spot, Inc. v. Hiring Partners, Inc.*, 387 S.W.3d 40, 49 n.15 (Tex. App. 2012) (non-compete unenforceable where "blue collar workers" did not receive specialized training).

Balint testified that advanced training materials were "discussed, but never developed," and when asked whether he ever provided more advanced training to DigitalDog, the only specifics he could offer were training on how to comply with DRN's contract. [APP. 446-49]. The terms of the contract are public: not only has the 2014 Agreement been published in this case without objection (Doc. 1, Ex. A), but the 2010 and 2014 Agreements were published as part of a prior litigation in this Court. *See* Case No. 4:14-cv-903 (N.D. Tex) at Doc. 88-1, pp. 6-42. As such, "training" on complying with the terms of a public agreement is not specialized or confidential.

*     *     *

DRN has put forth no evidence that DRN provided DigitalDog with specialized training to improve its efficiency and use of LPR technology. As discussed above, DRN also failed to provide evidence that DRN provided DigitalDog with confidential information.

DRN's litigation position about why the non-compete is justified is further undercut by its former CEO Metaxas, who admitted that DRN has known in the past that Affiliates have terminated their Affiliate Agreement with DRN and started working with a competitor of DRN's within one year. In those instances, DRN's decision on whether to sue the Affiliate was a "business decision" based on "business dynamics." [APP. 527-36]. DRN does not use non-competes to protect a legitimate business interest—and certainly not in the case of DigitalDog as this record reflects. The Court should find that DRN has failed to meet its burden of proof and invalidate the non-compete. *See Neurodiagnostic Tex*, 506 S.W.3d at 163-64; *Allan J.*

*Richardson*, 718 S.W.2d at 835; *Gorman*, 2011 WL 1642624, at *3.

### 3.  The Non-Compete is Unreasonable: Even if DRN Could Identify a Legitimate Interest Justifying a Non-Compete, This Non-Compete is Overbroad and Unreasonable

Even if DRN could demonstrate a business interest that theoretically justifies a non-compete (which it cannot), the non-compete the 2014 Agreement is unreasonable as written for multiple reasons:[21]

***Covered Employees.***  The non-compete unreasonably covers all 84 DigitalDog employees [APP. 503], regardless of their position, whether they performed services for DRN, and whether they were even exposed to DRN's LPR technology.  In particular, the non-compete applies to "any Related Parties" of DigitalDog, which includes its "officers, directors, *employees*, shareholders, members, partners, *agents* or *other representatives*."  [APP. 003, 010 (emphasis added)].  Nethery—who, again, had primary responsibility for drafting the 2014 Agreement [APP. 384-86]—testified that his general objective was to make the non-compete as broad as possible; not to draft or tailor the non-compete to DRN's alleged business justifications.  [APP. 518-19].  Because of that, he acknowledged the non-compete even covers *janitors* employed by DigitalDog, which he admitted was "[p]robably not" reasonable.  [APP. 397-98.]

Precluding every DigitalDog employee from performing any work whatsoever for DRN's competitors, including work "that would not require [the employees] to use any of [DRN's] confidential information, *such as a janitor position*, is an unreasonable restraint on competition." *Weber Aircraft, L.L.C. v. Krishnamurthy*, No. 4:12-CV-666, 2014 WL 12521297, at *8 (E.D. Tex. Jan. 27, 2014) (emphasis added).

---

[21] DRN has the burden of proof on showing the non-compete is reasonable. *See Allan J. Richardson*, 718 S.W.2d at 835.

*Prohibited Activities.* The non-compete unreasonably restricts DigitalDog employees from engaging in numerous, broad-based activities, including directly or indirectly: investing in or guaranteeing any obligation of, being associated or in any manner connected with, and being employed by, any person or entity engaged in or planning to become engaged in the business of using LPR technology and LPR data for repossessing vehicles. [APP. 010]. For example, the non-compete prevents DigitalDog from performing skip-tracing services (which DigitalDog has been doing for two decades) for Location Services, even if DigitalDog does not use any LPR cameras or software (indeed, the non-compete even prevents DigitalDog truck drivers that have worked for the company for years without ever running LPR cameras from performing skip tracing work for Location Services or any other DRN-competitor). [APP. 397, 508].

DRN made no attempt to tie the prohibited activities to the services DigitalDog actually performed for DRN, namely, collecting LPR data using DRN's LPR technology.[22] "A restrictive covenant is unreasonable unless it bears some relation to the activities of the employee." *Weber*, 2014 WL 12521297, at *8 (citations omitted). Texas courts have repeatedly held that overly broad non-competes like the one at issue here are unreasonable. *See id.* (finding non-compete "unreasonably broad" where it was "not related to the activities of the employee, and [did] not define the type of work in which the employee could not engage"); *McKissock*, 2016 WL 8138815, at *9 (finding unreasonable a non-compete under which employee could not "be employed or retained by, participate in or be connected in any manner with any business or practice which is in competition with [the employer]"); *APRM, Inc. v. Hartnett*, No. 01-01-00831-CV, 2002 WL 1435995, at *1 (Tex. App. July 3, 2002) (finding unreasonable a restrictive

---

[22] By contrast, the non-compete in the 2010 Agreement prohibited DigitalDog only from "operat[ing], individually or jointly with others, to utilize LPR technology" and from "join[ing] or becom[ing] a member of any group, consortium, affiliation or company that generates revenue from the capture of license plate data utilizing [LPR] technology." [APP. 147].

covenant that prevented employee from "engag[ing] or participat[ing]" in any business competitive with the business of the employer because the covenant's restriction was not "limited to the capacity in which [the employee] worked for [the employer]").

*Future Competition.* The non-compete is also unreasonable because it includes, within its coverage of off-limits competitors, "any person or entity" merely "*planning to become engaged* in the business of using LPR technology and LPR data" for repossessing vehicles. [APP. 010]. Texas courts have deemed unreasonable non-competes that similarly "prohibit[] the employee from working for companies that are not *current competitors*." *Leath v. Tracer Constr. Co.*, No. 1:08-CV-358, 2009 WL 8188138, at *6 (E.D. Tex. Aug. 18, 2009) (emphasis added).

*Temporal Scope.* The non-compete is unreasonable because it extends one full year from termination. [APP. 010]. "Texas courts have upheld covenants restricting competition for periods between one and two years, *but only if the evidence showed a need for such a lengthy period.*" *Rimkus Consulting Grp., Inc. v. Cammarata*, 255 F.R.D. 417, 436 (S.D. Tex. 2008) (emphasis added) (citations omitted) (collecting cases); *see CDX Holdings, Inc. v. Heddon*, No. 3:12-CV-126-N, 2012 WL 11019355, at *9 (N.D. Tex. Mar. 2, 2012). While DRN has the burden of proving the reasonableness of the non-compete, *see Allan J. Richardson*, 718 S.W.2d at 835, it has articulated no justification for a one-year term. Instead, Nethery, who principally drafted the 2014 Agreement, had no idea why DRN chose a one-year term. [APP. 392-93]. He explained that the one-year term was carried forward from the 2010 Agreement without any analysis as to whether it was justified:

> Q.    How was that time period selected?
> A.    I believe it was the same time period in the original affiliate
>       agreement. And I don't know how it was originally selected.

Q.   Did you, with other DRN employees, evaluate whether a one-year post-termination restriction was reasonable before rolling out the new agreement?

A.   I don't recall having specific discussions about that section of the agreement. . . . We tried to maintain as much consistency with what the original agreement was. We needed it updated for payment, and that was it.

[ . . . ]

Q.   To your knowledge, was the one-year post-termination period simply pulled forward from the original agreement?

A.   To my knowledge, yes.

Q.   Was there any evaluation, to your knowledge, whether a one-year post-termination period was still reasonable or necessary in 2014?

A.   Not to my knowledge.

[APP. 394-95].

Moreover, Balint testified that some of DRN's purportedly confidential information, including its historical hit list data, has a shelf life much shorter than one year. [APP. 441-42]. *See CDX*, 2012 WL 11019355, at *9 (holding that plaintiffs failed to meet burden of proving reasonableness of one-year non-compete in light of testimony that confidential information purportedly justifying the non-compete was "continually changing and updated and had a potentially short shelf life").

Even more, DRN includes a much shorter non-compete in contracts with Forwarding Companies—only *90 days* from termination—despite them receiving greater access to DRN's data and knowledge of DRN's business practices. [APP. 301, 414-20, 039].

***Geography.*** The non-compete is unreasonably broad because it applies nationwide, even though DigitalDog undisputedly performed services for DRN under the 2014 Agreement only within the State of California. *See supra* at § V.A.1.a.(i). Texas courts have repeatedly held that non-competes, like this one, that cover territory beyond where an employee actually worked are overbroad and unenforceable. *See, e.g., Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787, 793-94 (Tex. Ct. App. 2001) ("A covenant not to compete with a broad geographical scope is

unenforceable, particularly when no evidence establishes the employee actually worked in all areas covered by the covenant."); *Zep*, 824 S.W.2d at 660-61 (same); *Evan's World Travel*, 978 S.W.2d at 232-33 (where employee worked within single county in Texas, restriction barring employee from doing business anywhere in United States or state of Texas was "clearly an unreasonable restriction").

For all of these reasons, DRN cannot meet its burden of proving that the non-compete is reasonable under § 15.50. In fact, DRN knows the non-compete is unreasonable as written—the signatory of the 2014 Agreement, Nethery, admitted as much. [APP. 397-98]. Location Services asked, via Interrogatory No. 12, for DRN to disclose its contention as to how the non-compete should be reformed to render it enforceable, but DRN refused to respond. [APP. 041]. The Court should find that DRN has waived the right to have the non-compete reformed. *See* Fed. R. Civ. P. 37(a)(4), 37(c)(1); *see also Kenyon Int'l Emergency Servs., Inc. v. Malcolm*, No. H-09-3550, 2011 WL 6206766, at *1 (S.D. Tex. Dec. 13, 2011).

### C. The Court Should Grant Summary Judgment in Favor of DigitalDog's Two Counts and Against DRN's Breach of Contract Count

For the reasons set forth in Sections V.A. and V.B., above, DigitalDog is entitled to a declaratory judgment as a matter of law that the non-compete is unenforceable against it per Count I of the Complaint. Doc. 7 at ¶¶ 81-97.

A finding that the non-compete is unenforceable under Cal. Bus. & Prof. Code § 16600 resolves DigitalDog's unfair competition claim in Count II. Use of a covenant not to compete in violation § 16600 violates the California unfair competition statute, Cal. Bus. & Prof. Code § 17200 *et seq.*[23] *See Application Grp., Inc. v. Hunter Grp., Inc.*, 61 Cal. App. 4th 881, 908, 72 Cal. Rptr. 2d 73 (1998); *see also Arkley v. Aon Risk Servs. Cos., Inc.*, No. CV 12-1966 DSF

---

[23] Section 17200 provides in relevant part that "unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

(RZx), 2012 WL 2674980, at *5 (C.D. Cal. June 13, 2012) ("An employer's use of an illegal noncompete agreement also violates [Cal. Bus. & Prof. Code § 17200 *et seq.*].") (quoting *Dowell v. Biosense Webster, Inc.*, 179 Cal. App. 4th 564, 575, 102 Cal. Rptr. 3d 1 (2009)). Therefore, DigitalDog is entitled to summary judgment on both Counts.

A finding that the non-compete is unenforceable under California law also resolves DRN's breach of contract counterclaim because DigitalDog cannot be liable for breaching an unenforceable provision. *See SriCom, Inc. v. EbisLogic, Inc.*, No. 12-CV-00904-LHK, 2012 WL 4051222, at *5 (N.D. Cal. Sept. 13, 2012) (dismissing claim for breach of non-compete that was void under § 16600).

Finally, if Texas law is found to govern the non-compete, DigitalDog maintains that the non-compete is likewise invalid for the reasons discussed in Section V.B, and again, DigitalDog cannot breach an invalid provision. If the Court finds that, under Texas law, DRN has met its burden of demonstrating a legitimate business interest to protect and believes reformation is appropriate, the Court may reform the non-compete. But DRN had the burden of proof and, as discussed above, refused to even address reformation in discovery, waiving any right to seek reformation at this stage. *See supra* § V.B.2.b. And even if the non-compete is reformed, DRN cannot recover any money damages. *See Philip H. Hunke*, 815 S.W.2d at 857 ("An action for damages may not be predicated upon the breach of an unenforceable noncompete clause."). While, theoretically, DRN could attempt to pursue injunctive relief under a reformed non-compete, DigitalDog terminated the 2014 Agreement and stopped using LPR technology over 90 days ago—which is already longer than the non-competes that DRN uses with forwarding companies. [APP. 039, 242, 301, 345-46, 414-20]. Any reformation to the non-compete to make it reasonable and impose a restraint that is "not greater than necessary" to protect the

goodwill or other business interest of DRN (Tex. Bus. & Com. Code Ann. § 15.51(c)) would, at a minimum, limit the temporal scope to far less time than has already passed, making any injunctive relief moot. *See Weatherford Oil Tool Co. v. Campbell*, 161 Tex. 310, 314, 340 S.W.2d 950, 952 (1960) (indicating that the issue of reformation of a noncompetition covenant becomes moot after the term of the covenant has expired); *Leon's Fine Foods, Inc. v. McClearin*, No. 05-97-01198-CV, 2000 WL 277135, at *1 (Tex. App. Mar. 15, 2000) (not designated for publication) ("Once the non-competition period ends, the trial court's ability to enforce the covenant by injunction becomes moot.").

Therefore, the Court should enter summary judgment for DigitalDog on Count I of DRN's counterclaims. Doc. 18 at ¶¶ 26-38.

## VI. PRAYER

For these reasons, DigitalDog respectfully prays that this Honorable Court grant its Motion for Summary Judgment and enter a declaratory judgment that the non-compete is unenforceable, enter a judgment that DRN has violated California's Unfair Competition Law, and order that DRN's claim for breach of contract be dismissed with prejudice; and for such other relief, as law and in equity, to which it may show itself justly entitled.

Respectfully submitted,

_____

Marshall M. Searcy, Jr.
State Bar No. 17955500
E-mail: marshall.searcy@kellyhart.com
Frank P. Greenhaw IV
State Bar No. 24002179
E-mail: pete.greenhaw@kellyhart.com
Caroline Brownlie
State Bar No. 24101562
E-mail: caroline.brownlie@kellyhart.com
**KELLY HART & HALLMAN LLP**
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone:     (817) 332-2500
Facsimile:     (817) 878-9280

**ATTORNEYS FOR PLAINTIFF / COUNTER-
DEFENDANT BAY CITIES RECOVERY, INC.
d/b/a/ DIGITALDOG AUTO RECOVERY**

49

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on August 22, 2018, a true and correct copy of the foregoing

was served via the Court's CM/ECF system on all counsel of record as indicated:

> Messrs. Cole B. Ramey, W. Alan Wrights, and Timothy E. Taylor
> Kilpatrick Townsend & Stockton, LLP
> 2001 Ross Avenue, Suite 4400
> Dallas, Texas  75201
>
> Messrs. William L. Kirkman and Preston B. Sawyer
> Kirkman Law Firm, PLLC
> 201 Main Street, Suite 1160
> Fort Worth, Texas 76102
>
> Messrs. Adam L. Marchuk and Mark T. Smith
> and Ms. Caroline A. Teichner
> Perkins Coie LLP
> 131 S. Dearborn Street, Suite 1700
> Chicago, IL 60603

_____
Frank P. Greenhaw IV

50